Michael R. Lozeau (State Bar No. 142893)
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
E-mail: michael@lozeaudrury.com

Barak J. Kamelgard (State Bar No. 298822)
Benjamin A. Harris (State Bar No. 313193)
LOS ANGELES WATERKEEPER
360 E. 2nd Street, Suite 250
Los Angeles, CA 90012
Tel: (310) 394-6162
E-mail: barak@lawaterkeeper.org
         ben@lawaterkeeper.org

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California nonprofit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>GOLD BOND BUILDING PRODUCTS, LLC, a Delaware limited liability company,<br><br>Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

LOS ANGELES WATERKEEPER ("Waterkeeper" or "Plaintiff"), a California nonprofit corporation, by and through its counsel, hereby alleges:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On December 13, 2022, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of Waterkeeper's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

5.      This complaint seeks relief from Defendant's discharges of polluted storm water from Defendant's industrial facility located at 1850 Pier B Street, Long Beach, California, 90813 ("Facility"). These discharges and related procedural, planning, and reporting omissions are in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ, as renewed by Water Quality Order No. 2014-0057-DWQ, and as further amended on November 6, 2018 ("General Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.      With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7.      The Los Angeles/Long Beach Inner Harbor and Port of Long Beach are ecologically robust areas and important habitat for dozens of fish and bird species as

well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that Los Angeles area waters have for people in the surrounding communities. The public's use of Los Angeles area waters for water contact sports exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreation and aesthetic opportunities, such as wildlife observation are also impaired by polluted discharges into Los Angeles area waters.

8.     The Los Angeles/Long Beach Inner Harbor is impaired with, among other pollutants,  excessive toxicity and zinc. Industrial facilities, like Defendant's, that are discharging polluted storm water and non-storm water contribute to the impairment of the Inner Harbor and aquatic-dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

## III.   **PARTIES**

9.     Plaintiff LOS ANGELES WATERKEEPER is a nonprofit public benefit corporation organized under the laws of the State of California with its main office in Santa Monica, California. Founded in 1993, Waterkeeper is dedicated to the preservation, protection, and defense of the inland and coastal surface and groundwaters of Los Angeles County from all sources of pollution and degradation. Waterkeeper and its members are deeply concerned with protecting the environment in and around their communities, including the Los Angeles/Long Beach Inner Harbor. To further these goals, Waterkeeper actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of

itself and its members.

10. Waterkeeper has members living in the communities near the Facility and the Los Angeles/Long Beach Inner Harbor. They enjoy using the Los Angeles/Long Beach Inner Harbor and adjacent waters for recreation and other activities. Members of Waterkeeper use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause pollutants to be discharged. Members of Waterkeeper use those areas to recreate and view wildlife, among other activities. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

11. Waterkeeper brings this action on behalf of its members. Waterkeeper's interest in reducing Defendant's discharges of pollutants into the Los Angeles/Long Beach Inner Harbor and its tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Waterkeeper.

12. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

13. Defendant GOLD BOND BUILDING PRODUCTS, LLC ("Gold Bond" or "Defendant") is a Delaware limited liability company that owns and/or operates the

Facility.

## IV.   STATUTORY BACKGROUND

### Clean Water Act

14.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

16.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. S*ee* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

17.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator

of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

18.     The State Board elected to issue a statewide general permit for industrial storm water discharges ("General Permit"). The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992. The State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). On November 6, 2018, the General Permit was further amended to include additional effluent limitations and numeric action levels to be applied to industrial permittees that discharge storm water to waters that have been identified as impaired pursuant to Section 303(d) of the Act, 33 U.S.C. § 1313(d), including the Los Angeles/Long Beach Inner Harbor for zinc.

19.     In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

20.     The General Permit contains several prohibitions. Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. General Permit § V.A. Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or

threaten to cause pollution, contamination, or nuisance. General Permit § III.C. Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. General Permit § VI.B. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. General Permit §§ VI.A, III.D

21.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

22.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* General Permit, § X.C. These BMPs must achieve compliance with

the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X.B. Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet § I(1).

23.     Sections X.D-I of the General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of industrial materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges. The General Permit requires that all dischargers develop and implement a set of minimum BMPs (which are mostly non-structural BMPs) as well as any advanced BMPs (which are mostly structural) as necessary to achieve BAT/BCT, which serve as the basis for compliance with the General Permit's technology-based effluent limitations. *See* General Permit § X.H. The General Permit requires a comprehensive assessment of potential pollutant sources, specific BMP descriptions; and a BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented. *See* General Permit §§ X.G.2, 4-5. Section X.E of the General Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

24.     The General Permit requires dischargers to implement and maintain, to

the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping. *See* General Permit, § X.H.1. Failure to implement all of these minimum BMPs is a violation of the General Permit. *See* General Permit Fact Sheet § I(2)(o).

25.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See* General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id*. The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table. *See* General Permit § X.H.4-5.

26.     A facility must "ensure that the SWPPP identifies and justifies each minimum BMP or applicable advanced BMP not being implemented at the facility because they do not reflect best industry practice considering technological availability and economic practicability and achievability." General Permit, § X.H.4.b. A facility's SWPPP must also identify where the minimum BMPs in different areas of the facility will not adequately reduce the pollutants in the facility's storm water dischargers and identify advanced BMPs for those areas. General Permit

§ X.G.2. A Facility's BMPs must, at all times, be robust enough to meet the requirement of the General Permit and of 33 U.S.C. § 1342(p)(3)(A) that all discharges associated with industrial activities be subjected to BAT and BCT. General Permit §§ V.A, I.A.1, I.D.31-32.

27.     The General Permit requires facility operators to develop and implement an adequate Monitoring Implementation Plan for visual observations and for the sampling and analysis of storm water discharges. *See* General Permit, §§ X.I, XI. The primary objective of such monitoring is to both observe and to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations. Adequate monitoring and reporting ensures that best management practices ("BMPs") are effectively reducing and/or eliminating pollutants at a facility, and are evaluated and revised whenever appropriate to ensure compliance with the General Permit.

28.     Under the General Permit, facilities must analyze storm water samples for total suspended solids ("TSS"), Oil & Grease, pH, "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, " "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix," and additional parameters applicable based on a facility's Standard Industrial Classification ("SIC") code. General Permit, § XI.B.6.

29.     Facilities are required to make monthly visual observations of storm

water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. General Permit, § XI.A. The General Permit requires each discharger to maintain records of all of the visual observations required by the Permit. General Permit, § XI.A.3.

30.     Section XI.B.2 of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30). Storm water discharges trigger the sampling requirement under the General Permit when they occur during facility operating hours and are preceded by 48-hours without storm water discharge. General Permit, § XI.B. A sample must be collected from each discharge point at the facility within four hours of the start of the discharge or the start of facility operations if the discharge occurs within the previous 12-hour period. General Permit, § XI.B.5.

31.     The General Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location. General Permit, § XI.A.2. "The Discharger shall visually observe and record the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris, and source(s) of any discharged pollutants." *Id*., § § XI.A.2.c.

32.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV. Per Section XV.F of the General Permit, a facility's Annual Evaluation must include "[a] review

and effectiveness assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and are effective in reducing and preventing pollutants in industrial storm water discharges and authorized NSWDs." After conducting the Annual Evaluation, "[t]he Discharger shall revise the SWPPP, as appropriate, and implement the revisions within 90 days of the Annual Evaluation." *Id*. The General Permit then requires that a Discharger submit an Annual Report which includes the date of the Annual Evaluation as well as "[a]n identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year." General Permit § XVI.

33.    The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

34.    The General Permit establishes annual Numeric Action Levels ("NALs") and instantaneous maximum NALs. The following annual NALs have been established under the General Permit for pollutants discharged by Gold Bond: zinc – 0.26 mg/L; iron – 1.0 mg/L, and Total Suspended Solids – 100 mg/L.

35.    The General Permit requires that a Discharger compare the results of its storm water discharge samples to the adopted annual NALs and instantaneous maximum NALs. General Permit § XII.A.  An exceedance of an annual NAL occurs when the average of the analytical results for a pollutant obtained for all samples at the entire facility during a single reporting year is greater than the pollutant's annual NAL. The reporting year runs from July 1 to June 30. An instantaneous maximum

NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range (for pH).

36.    If sampling results for a given parameter indicate an NAL exceedance for that same parameter, the Discharger attains "Level 1 status," which commences on July 1 following the reporting year during which the exceedance occurred.  General Permit § XII.C.

37.    By October 1 following commencement of Level 1 status, the Discharger must complete a Level 1 Exceedance Response Action ("ERA") Evaluation.  General Permit § XII.C.1. As part of the Level 1 ERA Evaluation, the Discharger must "[i]dentify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances." *Id.* No later than January 1 following commencement of Level 1 status, the Discharger must submit via SMARTS a Level 1 ERA Report. General Permit § XII.C.2. The Level 1 ERA report must be prepared by a Qualified Industrial Stormwater Practitioner ("QISP") and must contain "[a] summary of the Level 1 ERA Evaluation" and "[a] detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL." *Id.* A Discharger can move back to Baseline status from Level 1 status only when: (1) a Level 1 ERA report has been completed; (2) all identified additional BMPs have been implemented; and (3) results from four consecutive QSEs sampled after BMP implementation indicate no additional NAL exceedances for that parameter." *Id.*

38.     If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." General Permit § XII.D. For Level 2 Status, a discharger is required to submit an Exceedance Response Action ("ERA") Action Plan and an ERA Technical Report requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit § XII.D.

**Basin Plan**

39.     The Regional Board has identified beneficial uses and established water quality standards for the Los Angeles/Long Beach Harbor, including all Inner Areas, and established water quality standards for these waters in the "Water Quality Control Plan, Los Angeles Region Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties," generally referred to as the Basin Plan.

40.     The beneficial uses of these waters include, among others, commercial and sport fishing, marine habitat, and habitat for rare, threatened, or endangered species. The waters also have a potential beneficial use for shellfish harvesting, either for human consumption, commercial, or sports purposes.

41.     Discharges of pollutants at levels above water quality standards contribute to the impairment of beneficial uses of the waters receiving the discharge, in violation of the General Permit.

42.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal,

or aquatic life."

43.     The Basin Plan includes contains a narrative floating material standard which states, "Waters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

44.     The Basin Plan includes a narrative solid, suspended and settleable materials standard which states, "Waters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses."

45.     The EPA has adopted saltwater numeric water quality standards for zinc of 0.09 mg/L (Criteria Maximum Concentration – "CMC"). 65 Fed. Reg. 31712 (May 18, 2000) (California Toxics Rule).

46.     The EPA 303(d) List of Water Quality Limited Segments lists the Los Angeles/Long Beach Inner Harbor as impaired for DDT, Benthic Community Effects, PCBs, copper, toxicity, chrysene, benzo(a)pyrene, and zinc. *See* Final 2018 California Integrated Report, Appendix A: 2018 303(d) List of Impaired Waters, available at: https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2018_integrated_report.html.

47.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $64,618 per day per violation, pursuant to Sections 309(d) and 505

of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.    STATEMENT OF FACTS

48.    Defendant owns and/or operates the Facility that manufactures and stores gypsum wallboard and stucco products, among other activities, in Long Beach, California.

49.    The Facility falls within Standard Industrial Classification ("SIC") Code 3275 ("Gypsum Products").

50.    Plaintiff is informed and believes, and thereupon alleges that Defendant has operated the Facility since prior to March 14, 2018. Plaintiff is informed and believes, and thereupon alleges that Defendant is a successor entity to New NGC, Inc.

51.    On or about March 14, 2018, Defendants filed a Notice of Intent with the State Board enrolling the Facility in the General Permit. Plaintiff is informed and believes, and thereupon alleges that, prior to March 14, 2018, the Facility was enrolled in the General Permit pursuant to a Notice of Intent filed by Defendant's predecessor entity, New NGC, Inc.

52.    The Facility covers approximately 18.5 acres of land. The majority of the Facility consists of impervious surface area.

53.    One of the main materials handled by the Facility, gypsum rock, is delivered to the Facility via ships in the Long Beach Harbor. Gypsum rock is transferred from the ships to a storage dome at the Facility site, and then taken via conveyor belt to the indoor manufacturing portion of the Facility. One of the Facility's major products is stucco, a white powdery substance which is produced by crushing, processing, and heating gypsum rock. The Facility's other main product, gypsum

wallboard, is created by mixing stucco with water and placing it between two sheets of paper to be cut, baked, and recut. Final products are stored both inside and outside the Facility's warehouse.

54.     The Facility collects storm water from its site and discharges storm water from at least fifteen drains at the Facility. The drains flow to at least two discharge locations downstream of the Facility. The Facility takes samples of its storm water drainages at two drain locations located near the edge of the Facility. The drains where samples are taken are identified as SL1 and SL2. Stormwater flowing at SL1 drains from a portion of Drainage Area 1 at the Facility. Drainage Area 1 is located at the northwest corner of the Facility. Stormwater flowing at SL2 drains from a portion of Drainage Area 2 at the Facility. Drainage Area 2 runs along the entire eastern half of the Facility. Based on information and belief, storm water discharged from the Facility flows directly to the Los Angeles/Long Beach Inner Harbor. Waters in the Los Angeles/Long Beach Inner Harbor flow into the Port of Long Beach and ultimately to the Pacific Ocean. (collectively, "Facility Receiving Waters").

55.     The Los Angeles/Long Beach Inner Harbor is a water of the United States. The Port of Long Beach is a water of the United States. The Pacific Ocean is a water of the United States.

56.     Plaintiff is informed and believes, and thereupon alleges that storm water flows over the surface of the Facility where industrial activities occur, including activities associated with the manufacturing and storing of gypsum wallboard and stucco products.

57.     Plaintiff is informed and believes, and thereupon alleges that storm water

flowing over these areas collects particulates, metals including zinc and iron, and other pollutants as it flows towards the storm water discharge locations.

58.     Plaintiff is informed and believes, and thereupon alleges that all storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

59.     Plaintiff is informed and believes, and thereupon alleges, that there are insufficient structural storm water control measures installed at the Facility. Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States. The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants. The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated. The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

60.     Since November 13, 2017, Plaintiff is informed and believes that Defendant has failed to take adequate storm drain samples due to an inadequate sample collection system. Defendant's July 2022 Level 2 ERA Technical Report states that at one of its sampling locations, "the hole in the grate is small and the site could not see the water being sampled at the bottom of the drainage line."

61.     As a result, Plaintiff is informed and believes, and thereupon alleges, that discharges at the Facility are occurring during qualifying storm events without the

requisite number of samples being taken, thus violating the requirements of the General Permit.

62.     During the 2021-2022 reporting year, Gold Bond only took two samples from SL1 and SL2, rather than the required four samples from each. LAW is informed and believes that additional qualifying storm events occurred at the Facility during the first half of the 2021-2022 reporting year on December 23, 2021 and December 29, 2021. During the 2020-2021 reporting year, Gold Bond only took one sample from SL1 and two samples from SL2, rather than the required four samples from each. LAW is informed and believes that additional qualifying storm events occurred at the Facility on March 3, 2021 and March 10, 2021. During the 2019-2020 reporting year, Gold Bond only took three samples from SL1 and SL2, rather than the required four samples from each. LAW is informed and believes that an additional qualifying storm event occurred at the Facility during the second half of the 2019-2020 reporting year on April 6, 2020. During the 2018-2019 reporting year, Gold Bond only took three samples from SL1, rather than the required four samples. LAW is informed and believes that additional qualifying storm events occurred at the Facility during the first half of the 2018-2019 reporting year on November 22, 2018 and December 6, 2018. As a result, Gold Bond has violated Section § XI.B.2 at least 6 times in the last five years by failing to take the requisite samples from Qualifying Storm Events.

63.     The levels of zinc in storm water detected at the Facility have exceeded the annual NAL for zinc of 0.26 mg/L established in the General Permit. During the 2018-2019 Reporting Year, the average level of zinc measured in the storm water samples collected by Defendant was 0.48 mg/L. During the 2019-2020 Reporting

Year, the average level of zinc measured in the storm water samples collected by Defendant was 0.80 mg/L. During the 2020-2021 Reporting Year, the average level of zinc measured in the storm water samples collected by Defendant was 0.37 mg/L. During the 2021-2022 Reporting Year, the average level of zinc measured in the storm water samples collected by Defendant was 1.145 mg/L. During the 2022-2023 Reporting Year, the average level of zinc measured in the storm water samples collected by Defendant was 1.68 mg/L. All of these average annual levels exceed the annual NAL for zinc.

64.     The levels of zinc in storm water detected by the Facility have exceeded the saltwater numeric water quality standard for zinc of 0.09 mg/L established by EPA in the California Toxic Rule. Because the waters of Los Angeles/Long Beach Inner Harbor are impaired by levels of zinc in excess of 0.09 mg/L, any discharge of zinc in excess of 0.09 mg/L causes or contributes to an exceedance of that water quality standard.

65.     The levels of iron in storm water detected at the Facility have exceeded the annual NAL for iron of 1 mg/L established in the General Permit. During the 2018-2019 Reporting Year, the average level of iron measured in the storm water samples collected by Defendant was 1.87 mg/L. During the 2019-2020 Reporting Year, the average level of iron measured in the storm water samples collected by Defendant was 3.58 mg/L. During the 2020-2021 Reporting Year, the average level of iron measured in the storm water samples collected by Defendant was 2.51 mg/L. During the 2021-2022 Reporting Year, the average level of iron measured in the storm water samples collected by Defendant was 7.75 mg/L. During the 2022-2023

Reporting Year, the average level of iron measured in the storm water samples collected by Defendant was 5.43 mg/L. All of these average annual levels exceed the annual NAL for iron.

66.     The levels of TSS in storm water detected at the Facility have exceeded the annual NAL for TSS of 100 mg/L established in the General Permit. During the 2021-2022 Reporting Year, the average level of TSS measured in the storm water samples collected by Defendant was 136 mg/L. During the 2022-2023 Reporting Year, the average level of TSS measured in the storm water samples collected by Defendant was 151.25 mg/L. All of these average annual levels exceed the annual NAL for TSS.

67.     Plaintiff is informed and believes, and thereupon alleges, that storm water discharges have occurred from the Facility on the dates listed in Attachment A of Exhibit A to this Complaint.

68.     On information and belief, Plaintiff alleges that since at least December 13, 2017, Defendant has failed to implement BAT and BCT at the Facility for its discharges of zinc, iron, and TSS, and other potentially un-monitored pollutants. Effluent Limitation V.A of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992. The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See*

General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id.* A Facility's BMPs must, at all times, be robust enough to meet the General Permit's and 33 U.S.C. § 1342(p)(3)(A)'s requirement that all discharges associated with industrial activities be subjected to BAT and BCT. General Permit §§ V.A, I.A.1, I.D.31-32.

69.     Based on the pollutant levels in the Facility's storm water discharges, the BMPs implemented to date at the Facility do not represent BAT and BCT. Plaintiff is informed and believes, and thereupon alleges, that the REM filters and Siltsoxx fiber rolls, combined with other minimum BMPs such as sweeping, employee training, dust control measures employed at the Facility, have not and will not consistently reduce zinc, iron or TSS to levels less than the annual NAL levels for these pollutants. Additional advanced BMPs, including storm water containment and treatment systems are available that can be feasibly installed and operated at the Facility. As of the date of this Complaint, Defendant has failed to implement minimum BMPs and advanced BMPs that achieve BAT and BCT.

70.     On information and belief, Plaintiff alleges that since at least December 13, 2017, Defendant has failed to implement an adequate SWPPP for the Facility, including but not limited to the following:

a. The General Permit requires the Facility's SWPPP to "[i]dentify and describe … any advanced BMPs (Section X.H.2) implemented to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs." General Permit, § X.C.1.b. The SWPPPs

prepared by Gold Bond to date fail to meet the General Permit's advanced BMP requirements because the SWPPPs only list "Notable BMP Projects Implemented by the Facility" and do not otherwise meet requirements such as listing the person responsible for implementing the BMP, implementation and maintenance procedures, necessary equipment, etc. The SWPPP fails identify advanced BMPs necessary to implement the BAT/BCT requirements and achieve the NALs, including storm water treatment. The SWPPP fails to identify applicable BMPs that are not being implemented and justify their exclusion.

b. The SWPPP is required to set forth "[t]he procedures to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences)." General Permit, § X.D.1.c. Three individuals are identified as members of the Facility's Pollution Prevention Team. Two of those members are responsible for collecting samples. The SWPPP also lists "Select additional staff, as necessary" and states that they are also responsible for assisting with BMP implementation and stormwater sampling, but no specific individual or position is identified. The SWPPP is violating Section X.D.1.c because it does not include procedures for assuring one of the team members' availability during any qualifying rain event.

c.  The General Permit requires that the discharger include in the SWPPP an assessment of all areas of industrial activity with potential industrial pollutant sources. General Permit, § X.G.2.a. The Facility's SWPPP includes a section entitled "Pollutant Source Assessment" which lists exposed activities/materials, activity/material locations, and potential pollutants. This assessment falls short of the assessment required by Section X.G.2.a and Section X.G.1.b. The assessment fails to include information such as the quantity and characteristics of industrial materials, the pathways through which the pollutants may be in contact with stormwater, relevant inspection records, and the effectiveness of BMPs to reduce or prevent pollutants in industrial storm water, among other requirements.

71.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to comply with ERA requirements due to its failure to include in its Technical Report adequate evaluations of additional BMPs that would reduce exceedances and failure to estimate costs of such additional BMPs. The need for these additional BMPs and a revised Level 2 ERA Technical Report is evidenced by the Facility's iron, zinc, and TSS exceedances of NALs and applicable water quality standards during the 2021-2022 and 2022-2023 reporting years.

72.  Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged from the Facility during rain events which then flows into the Los Angeles/Long Beach Inner Harbor, which flows into the Port of Long Beach and the Pacific Ocean.

73.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit. Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

74.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

75.     The General Permit's SWPPP requirements and Effluent Limitation V(A) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has failed to implement minimum BMPs, advanced BMPs, and BAT and BCT at the Facility for their discharges of zinc, iron, TSS and other potentially un-monitored pollutants in violation of Effluent Limitations V.A and X.H of the General Permit.

76.     Each day since March 27, 2018 that Defendant has failed to develop and implement minimum BMPs, advanced BMPs, and BAT/ BCT in violation of the

General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

77.    Defendant has been in violation of the BMP and BAT/BCT requirements every day since at least March 27, 2018. Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

**SECOND CAUSE OF ACTION**

**Failure to Prepare, Implement, Review, and Update**

**an Adequate Storm Water Pollution Prevention Plan**

**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

78.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

79.    Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

80.    Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*:

      a.  Defendant's failure to identify advanced BMPs at facility;

      b.  Defendant's failure to identify procedures for alternate team members; and

      c.  Defendant's failure to assess all areas of industrial activities.

81.    Defendant has been in violation of the Permit's SWPPP requirements every day since March 27, 2018. Defendant continues to be in violation of the SWPPP

requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

### THIRD CAUSE OF ACTION

**Failure to Develop and Implement an**

**Adequate Monitoring Implementation Plan**

**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

82.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

83.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges).

84.     Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility. General Permit, §§ X(I), XI. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by Defendant's failure to conduct required sampling and analysis.

85.     Each day since at least March 27, 2018, that Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

///

///

///

**FOURTH CAUSE OF ACTION**

**Discharges of Contaminated Storm Water**

**in Violation of Permit Conditions and the Act**

**(Violations of 33 U.S.C. §§ 1311, 1342)**

86.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

87.     Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

88.     Plaintiff is informed and believes, and thereupon alleges, that since at least March 27, 2018, Defendant has been discharging polluted storm water from the Facility in excess of the applicable water quality standards for zinc in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

89.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with zinc at levels above applicable water quality standards. The storm water from the Facility flows untreated into the Los Angeles/Long Beach Inner

Harbor. Plaintiff is informed and believes that storm water from the Facility then flows into the Port of Long Beach and ultimately flows to the Pacific Ocean.

90. The levels of zinc in the waters of the Los Angeles/Long Beach Inner Harbor are already violating the applicable water quality standards for zinc in the Basin Plan. Plaintiff is informed and believes, and thereupon alleges, that the Facility's discharges of storm water containing zinc levels in excess of 0.09 mg/L are causing or contributing to the violation of the applicable water quality standards in the Basin Plan in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

91. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation VI.B of the General Permit.

92. Every day since at least March 27, 2018 that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

## VII. RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a. Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b. Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.  Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.  Order Defendant to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.  Order Defendant to pay civil penalties of up to $64,618 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

j.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

k.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

§ 1365(d); and,

l.   Award any such other and further relief as this Court may deem appropriate.

Dated: July 10, 2023                    Respectfully submitted,


                                        By:    /s/ *Michael R. Lozeau*
                                               Michael R. Lozeau
                                               LOZEAU DRURY LLP
                                               Attorneys for Los Angeles Waterkeeper